NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3702-20

GRANDVUE MANOR, LLC,

      Plaintiff-Appellant,

v.

CORNERSTONE CONTRACTING
CORP., GEORGE PUSSER, and
DEREK D'AMBRA,

      Defendants-Respondents.

_____

**APPROVED FOR PUBLICATION**

**March 7, 2022**

**APPELLATE DIVISION**

Argued January 12, 2022 – Decided March 7, 2022

Before Judges Hoffman, Whipple and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1602-20.

Joseph B. Fiorenzo argued the cause for appellant (Sills Cummis & Gross, PC, attorneys; James M. Hirschhorn and David Phillips, of counsel and on the briefs; Joseph B. Fiorenzo, on the briefs).

Andrea C. Sisca (Ivey, Barnum & O'Mara, LLC) of the New York and Connecticut bars, admitted pro hac vice, argued the cause for respondents (Mueller Law Group, Andrea C. Sisca and Stephen G. Walko (Ivey, Barnum & O'Mara, LLC) of the New York and Connecticut bars, admitted pro hac vice, attorneys; Gregory K. Mueller, Paul S. Haberman, Andrea C. Sisca, and Stephen G. Walko, on the brief).

The opinion of the court was delivered by

WHIPPLE, J.A.D.

Plaintiff Grandvue Manor, LLC, (Grandvue) appeals from a July 7, 2021, Law Division order granting a motion to dismiss and compel arbitration with defendant Cornerstone Contracting Corp. (Cornerstone) and dismissing the complaint for lack of personal jurisdiction over defendants George Pusser and Derek D'Ambra. We affirm but remand to the trial court to correct the order and enter a stay pending completion of arbitration.

In 2017, Linda and Anthony Palmeri wanted to build a luxury home in Stanfordville, New York. They established Grandvue as a New Jersey limited liability corporation headquartered in Hackensack as the vehicle to build the home. On December 7, 2017, Grandvue entered into a contract with Cornerstone to build the $10 million residence. Cornerstone is a corporation headquartered in Greenwich, Connecticut. George Pusser is the President of Cornerstone and Derek D'Ambra is its Chief Financial Officer. The contract consisted of two American Institute of Architect (AIA) agreements; the Standard Form of Agreement Between Owner and Contractor (the Agreement), and the General Conditions for the Contract of Construction (General Conditions). The contract required substantial completion by April 7, 2019, which was within sixteen months from the date of the contract.

The contract contained a choice of law provision to govern by the law of the place where the project was located, excluding that jurisdiction's choice of law rules, and if the parties selected arbitration as the method of binding dispute resolution, then the Federal Arbitration Act would govern. Thus, the parties selected the law of New York, the place of the project, to govern the contract. With respect to initial dispute resolution, the Agreement provided that the architect would serve as the initial decision-maker unless the parties appoint another individual who was not a party to the Agreement.

Under section 6.2 of the Agreement, the parties checked the box "Arbitration pursuant to Section 15.4 of AIA Document A201-2017."

§ 6.2 Binding Dispute Resolution
For any [c]laim subject to, but not resolved by, mediation pursuant to Article [fifteen] of AIA Document A201-2017, the method of binding dispute resolution shall be as follows: . . .

[X] Arbitration pursuant to Section 15.4 of AIA Document A201-2017
[ ] Litigation in a court of competent jurisdiction
[ ] Other ([s]pecify)

If the [o]wner and [c]ontractor do not select a method of binding dispute resolution, or do not subsequently agree in writing to a binding resolution method other than litigation, [c]laims will be resolved by litigation in a court of competent jurisdiction.

Section 15.4 of the General Conditions states, in pertinent part:

§ 15.4 Arbitration

3

§ 15.4.1 If the parties have selected arbitration as the method for binding dispute resolution in the Agreement, any [c]laim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement. The [a]rbitration shall be conducted in the place where the [p]roject is located, unless another location is mutually agreed upon. A demand for arbitration shall be made in writing, delivered to the other party to the [c]ontract, and filed with the person or entity administering the arbitration. The party filing a notice of demand for arbitration must assert in the demand all [c]laims then known to that party on which arbitration is permitted to be demanded.

. . . .

§ 15.4.2 The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

The General Conditions define "claims," in pertinent part as follows:

A [c]laim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, a change in the [c]ontract [t]ime, or other relief with respect to the terms of the [c]ontract. The term "[c]laim" also includes other disputes and matters in question between the [o]wner and [c]ontractor rising out of or relating to the [c]ontract. . . .

On March 6, 2020, Grandvue filed a complaint against Cornerstone, Pusser, and D'Ambra. Grandvue alleged that defendants had not achieved

4

substantial completion of the project, breached the contract and the implied covenant of good faith and fair dealing, committed fraud and negligent misrepresentation, breached New York lien law, breached their fiduciary duties, committed conversion, unjustly enriched themselves, and violated the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -224, and the New Jersey Racketeer Influenced Corrupt Organization Act (RICO), N.J.S.A. 2C:41-1 to -6.2.

Defendants moved to dismiss for lack of personal jurisdiction over Cornerstone and Pusser and to compel arbitration pursuant to the provisions of the Agreement. A revised motion to dismiss for lack of personal jurisdiction included D'Ambra. Initially, the court denied the motions without prejudice and ordered discovery on the issue of personal jurisdiction. After jurisdictional discovery, defendants renewed their motions.

On July 2, 2021, the court delivered an oral opinion finding sufficient minimum contacts for personal jurisdiction over the individual defendants but dismissing the complaint for the matter to be submitted to arbitration. The court concluded that, under New Jersey law, the arbitration provision is clear and unambiguous as to the requirement that the parties submit to arbitration and as to the parties' waiver of their right to a jury trial. The court noted that

the litigants are sophisticated parties that freely entered into a contract to build a house for over $10 million.

On July 7, 2021, without explanation regarding the discrepancy with the transcript, the court entered an order dismissing the action for lack of personal jurisdiction as to Pusser and D'Ambra and compelling arbitration. This appeal followed.

## I.

We review the interpretation of a contract de novo. See Jennings v. Pinto, 5 N.J. 562, 569-70 (1950). We pay no special deference to the trial court's interpretation, so we review the contract with fresh eyes. Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011). Grandvue argues that, under this contract, it did not voluntarily waive its right to a jury trial for its statutory claims under CFA and RICO. We disagree.

As a threshold matter, we address whether the law of New Jersey or New York applies to the enforceability and construction of the arbitration provision. "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 341 (1992).

> [T]he law of the state chosen by the parties will apply, unless either:

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be the state of the applicable law in the absence of an effective choice of law by the parties.

[Id. at 342.]

Here, the parties clearly and unambiguously chose New York law, where the project is located. New York's law on choice of law provisions provides:

> The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection (a) of section 1-301 of the uniform commercial code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state. This section shall not apply to any contract, agreement or undertaking (a) for labor or personal services, (b) relating to any transaction for personal, family or household services, or (c) to the extent provided to the contrary in subsection (c) of section 1-301 of the uniform commercial code.
>
> [N.Y. Gen. Oblig. § 5-1401(1) (2018).]

In addition, with respect to the effect of an arbitration agreement, New York law provides:

A-3702-20

A written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award. In determining any matter arising under this article, the court shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute.

[N.Y. C.P.L.R. § 7501 (2021).]

The New York Court of Appeals elaborated as follows:

[T]he announced policy of [the State of New York] favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties. "One way to encourage the use of the arbitration forum" we recently noted "would be to prevent parties to such agreements from using the courts as a vehicle to protract litigation. This conduct has the effect of frustrating both the initial intent of the parties as well as legislative policy[.]" Matter of Weinrott (Carp), 32 N.Y.2d 190, 199 (1973). To this end the Legislature has assigned the courts a minimal role in supervising arbitration practice and procedures.

Generally it is for the courts to make the initial determination as to whether the dispute is arbitrable, that is "whether the parties have agreed to arbitrate the particular dispute." Steelworkers v. Am. Mfg. Co., 363 U.S. 564, 570-71 (1960). The ultimate disposition of the merits is of course reserved for the arbitrators and the courts are expressly prohibited from considering "whether the claim with respect to which arbitration is sought is tenable, or otherwise pass(ing) upon the merits of the dispute[.]" C.P.L.R. § 7501. Ideally then the courts should confine

A-3702-20

themselves to the arbitration clause and leave the overall contract to the arbitrators. This, of course, is facilitated when the arbitration clause specifies the issues which are subject to arbitration and those which are not.

More typically the parties adopt a "broad" arbitration clause agreeing generally to submit to arbitration all disputes arising out of the contract, or any dispute relating to the meaning and interpretation of the underlying agreement. Then the scope of the arbitration clause and the scope of the underlying agreement are identical, and disputes over interpretation run the hazard of being refined into questions of arbitrability. For instance in this case, the petitioners argue that since the "arbitration clause has no greater scope than does the treaty to which it relates" the courts must first define the limits of the substantive agreement before they can determine whether the dispute is arbitrable. Thus in order to reach the threshold question, the petitioners would have the courts first resolve the merits of the dispute—the ultimate issue in this case.

The way out of this apparent dilemma of course is to recognize that although the courts and the arbitrators in these cases cover the same field, they perform very different functions. Basically the courts perform the initial screening process designed to determine in general terms whether the parties have agreed that the subject matter under dispute should be submitted to arbitration. Once it appears that there is, or is not a reasonable relationship between the subject matter of the dispute and the general subject matter of the underlying contract, the court's inquiry is ended. Penetrating definitive analysis of the scope of the agreement must be left to the arbitrators whenever the parties have broadly agreed that any dispute involving the interpretation and meaning of the agreement should be submitted to arbitration[.]  See, e.g., Matter

9

of Exercycle Corp. (Maratta), 9 N.Y.2d 329, 214 (1961).

[Nationwide Gen. Ins. Co. v. Invs. Ins. Co. of Am., 332 N.E.2d 333, 335 (1975).]

Thus, New York law instructs that courts perform an initial screening "to determine in general terms whether the parties have agreed that the subject matter under dispute should be submitted to arbitration." Id. at 335.

Turning to this case, the parties clearly and unambiguously agreed to submit "any claim" not resolved by mediation to binding arbitration. "Claim" is broadly defined in the General Conditions as:

> [A] demand or assertion by one of the parties seeking, as a matter of right, payment of money, a change in the [c]ontract [t]ime, or other relief with respect to the terms of the [c]ontract. The term "[c]laim" also includes other disputes and matters in question between the [o]wner and [c]ontractor arising out of or relating to the [c]ontract. . . .

Because all of plaintiff's claims arise out of or relate to the contract, we conclude a New York court would likely enforce the arbitration provision as it is less broad than those it upheld in Singer v. Jefferies & Co., 575 N.E.2d 98, 99-101 (1991) (upholding an arbitration provision covering "any controversy arising out of the business of the employer"), Atlas Drywall Corp. v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners, 177 A.D.2d 612, 612-14 (2d Dept. 1991) (alteration in original) (upholding an

10

arbitration provision covering "all disputes between [the parties], <u>both within and without the agreement</u>"),  and <u>Nationwide</u>.

Moreover, the United States and the State of New Jersey have declared policies favoring arbitration.  <u>Martindale v. Sandvik, Inc.</u>, 173 N.J. 76, 84-85 (2002).

> As "the supreme law of the land regarding arbitration," <u>Goffe v. Foulke Management Corp.</u>, 238 N.J. 191, 207 (2019), "[the Federal Arbitration Act,] FAA . . . preempts any state rule discriminating on its face against arbitration," <u>Kindred Nursing Ctrs. Ltd. P'ship v. Clark</u>, 137 S. Ct. 1421, 1426 (2017). Significantly, however, the FAA "contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." <u>Volt Info. Scis. v. Bd. of Trs.</u>, 489 U.S. 468, 477 (1989).  And, although the FAA preempts state laws that treat arbitration agreements differently from other contracts, "the FAA specifically permits states to regulate contracts, including contracts containing arbitration agreements[,] under general contract principles." <u>Martindale</u>, 173 N.J. at 85.
>
> [<u>Arafa v. Health Express Corp.</u>, 243 N.J. 147, 164-65 (2020).]

"[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral rather than a judicial forum."  <u>Arafa v. Health Express Corp.</u>, 243 N.J. 147, 170 (2020) (quoting <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 628 (1985)).

11

With respect to the enforceability of arbitration agreements, the law of New Jersey diverges slightly from that of New York. Unlike New York courts, which perform an "initial screening" to determine whether the parties generally agreed to arbitrate claims, Nationwide, 332 N.E.2d at 335, New Jersey courts inquire into the substance of the arbitration provision to determine whether the parties expressly waived their right to seek relief in court. Our Supreme Court explained that

> [a]n arbitration clause, like any contractual clause providing for the waiver of a constitutional or statutory right, must state its purpose clearly and unambiguously. In choosing arbitration, consumers must have a basic understanding that they are giving up their right to seek relief in a judicial forum.
>
> . . . .
>
> The absence of any language in the arbitration provision that plaintiff was waiving her statutory right to seek relief in a court of law renders the provision unenforceable. An arbitration provision—like any comparable contractual provision that provides for the surrendering of a constitutional or statutory right— must be sufficiently clear to a reasonable consumer.
>
> [Atalese v. U.S. Legal Services Group, L.P., 219 N.J. 430, 435-36 (2014).]

The Court elaborated:

> We do not suggest that the arbitration clause has to identify the specific constitutional or statutory right guaranteeing a citizen access to the courts that is waived by agreeing to arbitration. But the clause, at

least in some general and sufficiently broad way, must explain that the plaintiff is giving up her right to bring her claims in court or have a jury resolve the dispute.[] Mutual assent to an agreement requires mutual understanding of its terms. After all, "[a]n effective waiver requires a [consumer] to have full knowledge of [her] legal rights" before she relinquishes them. See Knorr v. Smeal, 178 N.J. 169, 177 (2003).

. . . .

We emphasize that no prescribed set of words must be included in an arbitration clause to accomplish a waiver of rights. Whatever words compose an arbitration agreement, they must be clear and unambiguous that a consumer is choosing to arbitrate disputes rather than have them resolved in a court of law.[] In this way, the agreement will assure reasonable notice to the consumer. To be clear, under our state contract law, we impose no greater burden on an arbitration agreement than on any other agreement waiving constitutional or statutory rights.

[Id. at 446-47 (some alterations in original).]

We do not conclude, however, that the divergence of state case law calls for a different result than what the trial court determined because we agree with the trial court that these were sophisticated parties who elected arbitration clearly and unambiguously and that their statutory claims were arbitrable. Here, we discern no error in the order compelling arbitration because the arbitration provision is clear and unambiguous in waiving the right to a jury trial and covers the alleged disputes.

13

Plaintiff argues that the trial court erred in entering an order dismissing its complaint for lack of personal jurisdiction over Pusser and D'Ambra in contradiction of its findings that it had personal jurisdiction over these individuals. We agree that the trial court's order is inconsistent with its stated finding.

Here, because the error appears to be clerical, we remand for the trial court to correct the order pursuant to Rule 1:13-1. Additionally, we conclude the trial court should not have dismissed the complaint because the FAA provides that a party may request a stay if a court action has been commenced and that action involves "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Accordingly, we remand with direction that the trial court enter a new order.

Affirmed in part, remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION